**FICKS REED CO., Plaintiff,**

v.

**LOCAL 112 INTERNATIONAL UNION, ALLIED INDUSTRIAL WORKERS OF AMERICA, et al, Defendants.**

No. C–1–91–0035.

United States District Court, S.D. Ohio.

July 31, 1991.

---

Thomas Brennan, Cincinnati, Ohio, for plaintiff.

Robert Doggett, Cincinnati, Ohio, for defendants.

ORDER

CARL B. RUBIN, District Judge.

This is an action to vacate an arbitrator's award in a labor dispute pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. This matter is before the Court on cross-motions for summary judgment filed by plaintiff The Ficks Reed Company ("the Company") and defendants Local Union No. 112 of the International Union, Allied Industrial Workers of America, AFL–CIO, and the International Union, Allied Industrial Workers of America, AFL–CIO (collectively "the Union"). (Doc. Nos. 5, 11). Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court does hereby set forth its Findings of Fact, Opinion, and Conclusions of Law.

## FINDINGS OF FACT

1) Plaintiff Ficks Reed is an Ohio corporation with its principal place of business in Cincinnati, Ohio. The Company engages in business as a manufacturer of wicker and rattan furniture, related cabinets, and other case goods. The Company sells its products throughout the United States.

2) Defendant The International Union, Allied Industrial Workers of America, AFL–CIO, is a labor organization with its principal office in Milwaukee, Wisconsin.

3) Defendant Local Union No. 112 is a labor organization with its principal office in Cincinnati, Ohio.

4) The Union represents persons employed by the Company. The Union and the Company are parties to a series of collective bargaining agreements covering employment terms and conditions.

5) On September 30, 1989, the collective bargaining agreement between the Company and the Union expired.

6) On November 4, 1989, Union employees went on strike in order to compel the Company to agree to their bargaining demands.

7) During the strike, the Company hired 28 replacement employees.

8) On November 13, 1989, the Union and the Company resumed negotiations.

9) On that same date, the Company submitted a proposal entitled "Strike Replacements/Preferential Hiring of Strikers." It provided for persons who replaced striking employees to "remain in the employ of the Company unless terminated by the Company." The proposal also stated that striking employees would be recalled "as the need arises ... as determined by the Company" and that striking employees of the various job classifications within each department would be recalled "in the order of their seniority." (Doc. No. 1, Exhibit B).

10) The Union approved the Strike Replacements proposal ("the Strike Replacements Agreement") at a meeting on November 14, 1989. (Doc. No. 5, Exhibit F at 2).

11) At the same meeting on November 14th, the Union accepted a new agreement with the Company ("the New Contract") which became effective immediately. (Doc. No. 1, Exhibit A).

12) The New Contract pertains to the terms and conditions of employment in many areas including: seniority rights; wages and classifications; work hours; vacations and holidays; leaves of absence; health and safety; grievances; and medical, insurance, and pension plans.

13) The Strike Replacements Agreement and the New Contract comprised the terms on which the strike ended (collectively "the collective bargaining agreement").

14) The Company did not sign the New Contract until August 29, 1990.

15) The Strike Replacements Agreement contains no provision voiding or altering the New Contract. (Doc. No. 1, Exhibit C at 21).

16) The New Contract does not expressly incorporate the terms of the Strike Replacements Agreement.

17) Article 3, § 5(a)(3) of the New Contract provides that if an employee is to be laid off, he may be transferred to other jobs for training in order to replace an employee with the least seniority. The Company is obligated to train no more than five employees, no more than two in the same department, and no more than one in the same classification. (The "Trainee Clause").

18) Article 15, § 3 of the New Contract states that "the understanding and agreements arrived at by the parties ... are set forth in this Agreement" ("the Exclusivity Clause").

19) Article 11, § FOURTH(b) of the New Contract prohibits an arbitrator from modifying, amending, revising, or removing any of the New Contract's terms.

20) The New Contract states that "[t]he decision of the arbitrator ... shall be binding on both parties...." Article 11, § FOURTH(b) at 45.

21) The strike ended on November 14, 1989.

22) The Union filed grievances between November 16 and November 22 on behalf of 15 persons whom the Company failed to rehire.

23) Pursuant to the New Contract's terms, the parties submitted the grievances to an arbitrator, who held a hearing on this matter on October 23, 1990.

24) Subsequent to this hearing, the arbitrator determined that the Company paid the 28 replacement employees as trainees and that the replacement employees were indeed trainees. (Doc. No. 1, Exhibit C at 21).

25) The arbitrator rendered a decision in favor of the Union. He concluded that the Company's training of more than five replacement employees violated the Trainee Clause's limitation of five trainees. The arbitrator then ordered the Company to recall all but the five former strikers with the least seniority. (Doc. No. 1, Exhibit C at 23).

## OPINION

The summary judgment procedure under Rule 56 of the Federal Rules of Civil Procedure is designed to secure an action's just, speedy, and inexpensive resolution. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Rule 56(c) permits the Court to grant summary judgement as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate the absence of any genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552. By virtue of the parties' filing of cross-motions for summary judgment, the parties agree that no genuine issues of material fact exist as to the issues raised in this action.

### The Arbitrator's Award

At the November 14, 1989 meeting, the Union agreed to enter into a new collective bargaining agreement with the Company by ratifying two separate documents: the New Contract and the Strike Replacements Agreement. These documents, which dealt with distinct subject matters, comprised the terms on which the strike ended.

After the strike ended in November, 1989, the Company refused to recall all former strikers to their jobs. The Union filed grievances which were submitted to an arbitrator. After examining both the Strike Replacements Agreement and the New Contract, the arbitrator determined that Article 3, § 5(a)(3) in the New Contract, which limited the number of certain trainees to five, controlled the outcome of the dispute before him.[1] He found that the 28 employees hired by the Company to replace the strikers were "trainees" and that the training of all but five violated the New Contract's Trainee Clause. The arbitrator ordered the Company to recall all but five of the former strikers.

### Claims of the Parties

The Company brought this action pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, seeking an order vacating the arbitrator's award. The Company also seeks reimbursement of its costs expended in this litigation, including attorney fees. In its motion for summary judgment the Company advances three grounds in support of its position that the arbitrator's award should be vacated: (1) the arbitrator ignored and drew no essence from the Strike Replacements Agreement; (2) he exceeded the scope of the issues submitted to him; and (3) the arbitrator's conclusion that the New Contract's Trainee Clause had been violated is not supported by any evidence.

The Union refutes the Company's claims and urges this Court to uphold the arbitrator's decision, ruling thereby in its favor. The Union has counterclaimed, seeking: (1) the Court's affirmation of the arbitrator's decision; (2) a judgment entered against the Company for the amount of back pay this Court determines each grievant should receive, or the submission of this issue to an arbitrator; (3) an Order directing the Company to comply with the arbitration award; (4) dismissal of the Company's complaint; and (5) recovery of attorney fees, expenses, and costs.

### The Applicable Standard of Review

A Court must limit its review of an arbitration award in a labor dispute to whether or not the arbitrator's award "draws its essence" from the collective bargaining agreement. *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). An arbitration award fails to draw its essence from a collective bargaining agreement when the award: (1) conflicts with the agreement's express terms; (2) imposes additional requirements that the agreement does not expressly provide; (3) cannot be rationally derived from the agreement's terms; or (4) is based on general considerations of fairness and equity rather than on the precise terms of the agreement. *Cement Division, Nat'l Gypsum Co. (Huron) v. United*

---

1. The relevant text of Article 3, § 5(a)(3) reads: "If ... an employee is still to be laid off, he or she may be transferred to jobs with an experience factor degree rating of 3, 4, or 5 ... for training on which he or she has no previous experience to replace an employee with the least seniority.... The Company, at any one time, will train no more than five employees, no more than two of which shall be in the same department, and no more than one of which in the same classification. The Company will have the right to reject an employee for training if his or her previous work experience indicates he or she has little or no probability of satisfactorily performing the work at hand...."

*Steelworkers of America, AFL–CIO–CLC, Local 135,* 793 F.2d 759, 766 (6th Cir.1986).

This standard of review ascertains whether or not the arbitrator employed the contractual interpretation for which the parties bargained. *Industrial Mutual Association Inc. v. Amalgamated Workers Local 383,* 725 F.2d 406, 409 (6th Cir.1984). A Court must defer to an arbitrator's decision if the arbitrator arguably construed or applied the contract. *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1988). The arbitrator, however, cannot ignore the plain language of the contract. *Id.*

### The Arbitrator and the Collective Bargaining Agreement

An arbitration award draws no essence from a collective bargaining agreement when it conflicts with the agreement's express terms. *Cement Division,* 793 F.2d at 766. The Strike Replacements Agreement, by its title and content, covers the rehiring of striking workers. In explicit and unequivocal language, it provides that persons who replace striking employees "shall remain in the employ of the Company unless terminated by the Company." The Strike Replacements Agreement further provides that striking employees of the various job classifications within each department shall be recalled "in the order of their seniority" and that striking employees "will be recalled as the need arises ... as determined by the Company."

■ In his decision, the arbitrator ignored the Strike Replacements Agreement on the grounds that it "does not state that any provision of the [New Contract] was voided, altered, etc., with respect to employees working at the plant." Doc. No. 1, Exhibit C at 21. The absence of such language does not justify the arbitrator's position that he may ignore the Strike Replacements Agreement's express language. The Union ratified the New Contract and the Strike Replacements Agreement at its November 14th meeting. These contemporaneous documents became the collective bargaining agreement between the Union and the Company. It is inconceivable that the Union or the Company would have intended the New Contract to nullify the Strike Replacements Agreement without express language to that effect. Since the Strike Replacements Agreement directly addresses the dispute between the Union and the Company, the arbitrator wrongfully ignored this document.

■ The Union raises several arguments in support of its position that the arbitrator properly disregarded the Strike Replacements Agreement. First, the Union maintains that the New Contract's Exclusivity Clause causes the New Contract to supersede the Strike Replacements Agreement. The Exclusivity Clause reads:

> [D]uring the negotiations, which resulted in this Agreement, each [party] had the unlimited right and opportunity to make demands and proposals ... and that the understanding and agreements arrived at by the parties ... are set forth in this Agreement.

Article 15, § 3 at 52. The next sentence of the New Contract places the Exclusivity Clause in context:

> *Therefore, the Company and the Union* for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other *shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement,* except as otherwise provided in this Agreement. (emphasis added).

Thus, the Exclusivity Clause in the New Contract pertains only to the "subject or matter referred to, or covered" in the New Contract. The New Contract, unlike the Strike Replacements Agreement, does not contain any provisions pertaining directly to the Company's replacement of striking workers or the Company's obligation to recall former strikers. Since the Exclusivity Clause does not state that the New Contract is the sole operative agreement between the parties, the clause should not be interpreted to exclude the Strike Replacements Agreement from the overall collective bargaining agreement in effect between the parties.

The Union contends that the arbitrator properly disregarded the Strike Replacements Agreement on a second basis: the Company's delay in signing the New Contract until August 29, 1990 resulted in the New Contract modifying the Strike Replacements Agreement which had become effective at an earlier date, specifically on November 14, 1989. This argument must be rejected on two principal grounds: (1) the Union itself concedes in its brief that the New Contract became effective on November 14, 1989, the same day as the Strike Replacements Agreement; and (2) any ambiguous language in the New Contract that arguably relates to the recall of former strikers does not supersede the Strike Replacements Agreement's plain, unequivocal terms which are directly on point.

The Union further argues that by disregarding the Strike Replacements Agreement's express terms, the arbitrator "honored" Article 11, § FOURTH(b) of the New Contract which prohibits an arbitrator from modifying, amending, revising, or removing any terms in the New Contract. This Court finds no terms in the New Contract that would have been modified, amended, revised, or removed had the arbitrator applied the unambiguous language of the Strike Replacements Agreement.

Contrary to the plain language of the Strike Replacements Agreement, the arbitrator required the Company to recall all but the five former strikers with the least seniority. The arbitrator relied upon a single sentence in the New Contract referred to here as the Trainee Clause:

> The Company, at any one time, will train no more than five employees, no more than two of which shall be in the same department, and no more than one of which in the same classification.

**2.** Courts are bound by the arbitrator's findings of fact. *Intern'l Brotherhood of Electrical Workers, Local 429 v. Toshiba America, Inc.,* 879 F.2d 208, 209 (6th Cir.1989); see also *Misco,* 484 U.S. 29 at 38, 108 S.Ct. at 371.

**3.** By ignoring the contextual language surrounding the Trainee Clause in § 5(3) of the New Contract, the arbitrator violated Article 11, § FOURTH(b) of the New Contract which pro-

Article 3, § 5(a)(3). Having found that the 28 replacement workers were "trainees," [2] the arbitrator ruled that the training of 28 replacement workers violated the maximum of five trainees allowed by § 5(a)(3) of the New Contract. The arbitrator concluded that all grievants, except five, should be recalled to their former jobs.

In arriving at this conclusion, the arbitrator ignored critical language in the sentence preceding the Trainee Clause which places the clause in context:

> *"If ... an employee is* still *to be laid off, [an employee with seniority] may be transferred to jobs* with an experience factor degree rating of 3, 4, or 5 ... *for training* on which he or she has no previous experience *to replace an employee with the least seniority...."* (emphasis added)

Thus, § 5(a)(3) of the New Contract requires the Company to train no more than five employees with seniority as a means to avoid laying them off. The language surrounding the Trainee Clause makes clear that the Trainee Clause applies only to existing employees with seniority rather than to newly hired employees. The Trainee Clause sets no limit on the number of *new* employees that the Company may train. Section 5(a)(3) makes no reference to the Company's obligations in the event of a strike.[3] In determining whether or not an arbitrator drew the essence of his award from the collective bargaining agreement, a Court may consider both the language and context of the collective bargaining agreement. *Timken Co. v. United Steelworkers of America,* 482 F.2d 1012, 1015 (6th Cir.1973). Because the arbitrator's decision disregarded the context of the Trainee Clause, the decision did not draw its essence from the agreement in effect between the Union and the Company.

hibits the arbitrator from removing, modifying, amending, or revising the terms of the New Contract. The arbitrator in effect removed the Trainee Clause's exclusive applicability to employees with seniority who would otherwise be laid-off. Interpreting the Trainee Clause as applicable to new employees was tantamount to modifying, amending, or revising the Trainee Clause.

### The Arbitrator Imposed Additional Requirements

 Furthermore, an arbitration decision draws no essence from a collective bargaining agreement if the decision imposes additional requirements which the agreement does not expressly provide. *Cement Division*, 793 F.2d at 766. In this case, § 5(a)(3) of the New Contract contains no language mandating the recall of employees who on their own volition have refused to work. The arbitrator improperly read this requirement into the New Contract and, on this basis, ordered the Company to recall all but five former strikers. The arbitrator's decision was not rationally derived from the language of the collective bargaining agreement. *Id.* at 766.

### The Arbitrator Did Not Arguably Construe Agreement

Finally, the Union contends that because the arbitrator was "arguably construing or applying the contract," this Court cannot overturn his decision. *Misco*, 484 U.S. at 38, 108 S.Ct. at 371. However, it is not even arguable that the arbitrator construed or applied the critical, contextual language adjacent to the Trainee Clause. Neither is it arguable that the arbitrator construed or applied the plain and unambiguous terms of the Strike Replacements Agreement. The arbitrator did not, as the Union suggests, interpret ambiguous provisions in the collective bargaining agreement. Rather, he failed to interpret clear and relevant portions of the agreement altogether. This violated the admonition that "[t]he arbitrator may not ignore the plain language of the contract." *Id.*

 The record demonstrates that the arbitrator based his award on personal notions of industrial justice rather than on the plain language of the collective bargaining agreement in effect between the parties. *Cement Division*, 793 F.2d at 766. This notion offends the collective bargaining process itself in which employers and employees negotiate their contractual relationship. The Company is entitled to the benefit of its bargain even though it may be unfair or inequitable to the Union. *See*

*Sears Roebuck and Co. v. Teamsters Local Union No. 243*, 683 F.2d 154, 156 (6th Cir.1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983).

Since it cannot be said that the arbitrator's decision drew its essence from the collective bargaining agreement, this Court is warranted in setting aside his decision. *See United Steelworkers of America*, 363 U.S. at 597, 80 S.Ct. at 1361. Consequently, it is unnecessary to consider the Company's contention that the arbitrator exceeded the scope of his authority.

This Court finds that Article 11, FOURTH(a) of the New Contract expressly provides that arbitration be used to settle disputes. Without reaching the merits of the parties' dispute, *Misco*, 484 U.S. at 40–41, n. 10, 108 S.Ct. at 371–372, n. 10, this Court observes that further arbitration over the Union's grievances must entail an interpretation of all pertinent provisions of the collective bargaining agreement. This Order does not preclude the arbitrator from interpreting the Trainee Clause of the New Contract in a manner consistent with its context and with the Strike Replacements Agreement.

### CONCLUSIONS OF LAW

1) The arbitrator's award did not draw its essence from the collective bargaining agreement. *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

2) The arbitrator's award conflicted with express terms in the collective bargaining agreement; imposed additional requirements not expressly provided for in the agreement; was not rationally derived from the language of the collective bargaining agreement; and was based upon personal notions of industrial justice rather than on the terms of the collective bargaining agreement. *Cement Division, Nat'l Gypsum Co. (Huron) v. United Steelworkers of America, AFL–CIO–CLC, Local 135*, 793 F.2d 759, 766 (6th Cir.1986).

3) The arbitrator did not arguably construe or apply the Strike Replacements

Agreement or the contextual language of the Trainee Clause in the New Contract. *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1988).

Accordingly, plaintiff's motion for summary judgment is well-taken and is hereby GRANTED. Defendant's motion for summary judgment is DENIED. It is hereby ORDERED that the arbitrator's award is VACATED. Plaintiff may file within 30 days of the date of this Order a motion for costs and attorney fees.

IT IS SO ORDERED.